750 So.2d 6 (1999)
Kayle Barrington BATES, Appellant,
v.
STATE of Florida, Appellee.
No. 86,180.
Supreme Court of Florida.
October 7, 1999.
Rehearing Denied December 10, 1999.
*8 Thomas H. Dunn, Rochester, New York, for appellant.
Robert A. Butterworth, Attorney General, and Mark S. Dunn, Assistant Attorney General, Tallahassee, Florida, for appellee.
PER CURIAM.
Kayle Bates appeals the sentence of death which he received on resentencing for the 1982 murder of Janet Renee White. We have jurisdiction, art. V, § 3(b)(1), Fla. Const., and affirm.
In 1983, a jury convicted appellant of first-degree murder, kidnapping, attempted sexual battery, and armed robbery. After the penalty phase proceeding, the trial judge sentenced appellant to death for the first-degree murder conviction in accordance with the jury's recommendation, to two terms of life imprisonment for the kidnapping and armed robbery convictions, and to fifteen years for the attempted sexual battery conviction.
In sentencing appellant to death, the trial court found the following aggravating circumstances: capital murder committed during the commission of three felonies; capital murder committed to avoid arrest; capital murder committed for pecuniary gain; capital murder which was especially heinous, atrocious, or cruel (HAC); and *9 capital murder committed in a cold, calculated, and premeditated manner (CCP). On appeal, this Court affirmed the convictions and the sentences on the noncapital convictions. Bates v. State, 465 So.2d 490, 491 (Fla.1985). However, we struck the CCP and avoid-arrest aggravating circumstances and remanded the case to the trial court for reconsideration of appellant's sentence for the first-degree murder conviction.
On remand, the trial court again imposed a death sentence. This Court affirmed. Bates v. State, 506 So.2d 1033 (Fla.), cert. denied, 484 U.S. 873, 108 S.Ct. 212, 98 L.Ed.2d 163 (1987). The Governor signed appellant's first death warrant in November 1989. Appellant subsequently filed a motion to vacate his death sentence pursuant to Florida Rule of Criminal Procedure 3.850, claiming that his trial counsel in the original sentencing proceeding was ineffective for failing to investigate appellant's background adequately. The trial court granted the motion and ordered resentencing before a jury. This Court affirmed. Bates v. Dugger, 604 So.2d 457 (Fla.1992), cert. denied, 507 U.S. 992, 113 S.Ct. 1600, 123 L.Ed.2d 163 (1993).
After appellant's second resentencing proceeding, the jury recommended death by a vote of nine to three. The court found three aggravating circumstances: capital murder committed during an enumerated felony (kidnapping and attempted sexual battery); capital murder committed for pecuniary gain; and HAC. The court found two statutory mitigating circumstances: no significant history of prior criminal history (significant weight); and appellant's age of twenty-four at the time he committed the murder (little weight). The court found eight nonstatutory mitigating circumstances: appellant was under some emotional distress at the time of the murder (significant weight); appellant's ability to conform his conduct to the requirements of the law was impaired to some degree (significant weight); appellant's family background (some weight); appellant's national guard service (little weight); appellant was a dedicated soldier and patriot (little weight); appellant's low-average IQ (little weight); appellant's love for his wife and children and being a supportive father (some weight); and appellant was a good employee (little weight).
After weighing the relevant factors, the court determined that the aggravators outweighed the mitigators and imposed the death penalty. Appellant raises nine issues on appeal.[1] We dismiss without discussion part of issue eight as well as issue nine, as they are without merit.[2]
In his first and second issues and part of his third issue, appellant contends that the trial court erred in refusing to *10 instruct the jury that if he were sentenced to life in prison for the murder committed in 1982, his sentence would be without any possibility of parole, as section 775.082(1), Florida Statutes (1995), provided at the time of the resentencing in 1995. Appellant claims that the trial court's refusal to apply section 775.082(1), Florida Statutes (1995), retroactively denied him due process and a fundamentally fair capital sentencing under the Eighth and Fourteenth Amendments to the United States Constitution.
In Florida, without clear legislative intent to the contrary, a law is presumed to apply prospectively. See State v. Lavazzoli, 434 So.2d 321, 323 (Fla.1983); McCarthy v. Havis, 23 Fla. 508, 2 So. 819, 821 (1887); Bond v. State, 675 So.2d 184, 185 (Fla. 5th DCA 1996). Retroactive application of the law is generally disfavored, see Herbert Broom, Legal Maxims 24 (8th ed. 1911) ("Retrospective laws are, as a rule, of questionable policy, and contrary to the general principle that legislation by which the conduct of mankind is to be regulated ought to deal with future acts, and ought not to change the character of past transactions carried on upon the faith of the then existing law."); and any basis for retroactive application must be unequivocal and leave no doubt as to the legislative intent. See Larson v. Independent Life & Accident Ins. Co., 158 Fla. 623, 29 So.2d 448 (1947); see also Broom, supra at 25 ("It is a general principle of our law that no statute shall be construed so as to have a retrospective operation, unless its language is such as plainly to require that construction.").
In 1994, the Legislature enacted chapter 94-228, Laws of Florida, section 1 of which amended the statute on penalties for crimes to make life without the possibility of parole the alternative punishment to a death sentence for the crime of first-degree murder. See § 775.082(1), Fla.Stat. (Supp.1994). Section three of the session law states that "[t]his act shall take effect upon becoming a law." The act was approved by the Governor and became effective May 25, 1994. Thus, the amended sentencing statute applies to all crimes committed after May 25, 1994. We find no unequivocal language that the Legislature intended this amendment to apply retroactively
We have previously held that this statute was not applicable to crimes committed before its effective date. Hudson v. State, 708 So.2d 256 (Fla.1998); Williams v. State, 707 So.2d 683, 684 n. 1 (Fla.1998); Craig v. State, 685 So.2d 1224, 1230 n. 12 (Fla.1996). We similarly reject appellant's contention.[3]
Our analysis of this issue causes us to reject appellant's waiver arguments. Because the 1994 amendment can have no effect on appellant's sentencing, we conclude that the waiver of an ex post facto claim in respect to the 1994 amendment to section 775.082 is of no consequence. The waiver of ex post facto rights would only be an issue if the statute could have an effect on appellant's sentence which, as we have stated, it cannot.[4]
*11 Appellant's alternate contention, that the jury should have been advised that appellant would agree to waive the possibility of parole, is also unavailing under Florida's capital sentencing scheme because, as the trial court ruled, "[a] defendant cannot by agreement confer on the court the authority to impose an illegal sentence." Williams v. State, 500 So.2d 501, 503 (Fla.1986). At the time appellant committed this murder, the Legislature had not established life without the possibility of parole as punishment for this crime.
In his second issue, appellant argues that the State took advantage of the trial court's failure to instruct the jury on a sentence of life without the possibility of parole during cross-examination of appellant's witnesses and closing argument by making future dangerousness an issue for the jury. Appellant did not object to either the State's cross-examination or closing argument on this ground, and the issue is therefore procedurally barred. Steinhorst v. State, 412 So.2d 332, 338 (Fla. 1982). Moreover, after reviewing the record, we do not agree that the State's cross-examination or argument raised the specter of appellant's future dangerousness.
Within this issue appellant focuses on a question posed by the jury during its deliberations: "[A]re we limited to the two recommendations of life with minimum 25 years or death penalty. Yes. No. Or can we recommend life without a possibility of parole. Yes. No." In response to this question, the trial court informed the jury by written response, "The court has advised you what advisory sentences you may recommend. Please refer to your copy of the jury instructions." We find that the trial court's response was appropriate and is in accordance with our decisions in Whitfield v. State, 706 So.2d 1, 5 (Fla.1997), and Waterhouse v. State, 596 So.2d 1008, 1015 (Fla.1992).
As part of his third issue, appellant contends that the fact that he was already sentenced to two life terms plus fifteen years and that those sentences were to run consecutively to the sentence for the murder was relevant mitigation "in the sense that [it] might serve as a basis for a sentence less than death." We have rejected similar arguments in Franqui v. State, 699 So.2d 1312, 1326 (Fla.1997); Marquard v. State, 641 So.2d 54 (Fla.1994); and Nixon v. State, 572 So.2d 1336 (Fla.1990).
These other sentences are not relevant mitigation on the issue of whether appellant will actually remain in prison for the length of those sentences. The length of actual prison time is affected by many factors other than the length of the sentence imposed by the sentencing court. The introduction of this evidence would open the door to conjecture and speculation as to how much time a prisoner serves of a sentence and distract jurors from the relevant issue of what is the appropriate sentence for the murder conviction. Regarding this issue appellant's brief states "[T]he state argued that [appellant] would be eligible for parole after serving the mandatory minimum." Appellant, however, makes no record reference to support that statement; nor has our independent review of the record revealed support for that statement. As we stated regarding the previous issue, our review of the record causes us to find that the State did not violate Hitchcock v. State, 673 So.2d 859, 860 (Fla.1996), by injecting appellant's future dangerousness into its evidence or argument. We conclude that the trial court followed our precedent and did not abuse its discretion in respect to this issue.
Appellant also contends that the trial court erred in not admitting into evidence a petition vouching for appellant's good character which was signed by people from Riviera Beach, where appellant was raised. The signatures were gathered by Forreste Williams, appellant's childhood friend. Mr. Williams testified in detail *12 about how he gathered the signatures on the petition. Regarding the admission of the petition, the trial court ruled:
At this point he's testified that he presented a list, he has two hundred people that signed that and I don't think the document should come into evidence. He's already indicated that these people provided their names and they have got these people that could testify. So, I'll sustain the state's objection to the list itself going into evidence. But he can certainly testify about it, which he's already done.
We find no abuse of discretion in this ruling. Moreover, any error on this point is harmless beyond a reasonable doubt because the information contained in the petition regarding appellant's good character would merely have been cumulative to appellant's numerous other character witnesses.
Another part of appellant's third issue involves a photograph of appellant in his military uniform which appellant claims the trial court ruled to be inadmissible. The record reflects that an enlarged photograph was offered and denied admission in the January 1995 resentencing, which ended in a mistrial. At the May 1995 resentencing, which is the subject of this review, the record reflects that there was a discussion concerning the substituting of a smaller photograph for the larger photograph. Appellant, however, never offered either the smaller or enlarged photograph into evidence. Thus, the issue as to the smaller photograph was not preserved. Furthermore, appellant presented two fellow National Guard soldiers to testify about appellant's dedication to his country. Thus, even assuming that the photograph had been offered into evidence at the resentencing, the picture was only cumulative on this point, and any error in denying its admission would be harmless beyond a reasonable doubt.
In his fourth issue, appellant contends that his death sentence is disproportionate. In his proportionality argument, appellant relies primarily upon the mitigation evidence he presented. The trial judge found that the absence of prior criminal activity from appellant's record was a statutory mitigator entitled to significant weight. The trial judge also found that appellant "was under the influence of some emotional disturbance at the time of the murder" and that appellant's "capacity to conform his conduct to the requirements of the law was impaired to some degree." (Emphasis added.) The trial judge gave this nonstatutory mitigation significant weight. In addition, the trial judge found appellant's age, his family and community relationships, his service in the National Guard, his low-average IQ, his employment, and his love for his family to be mitigating factors entitled only to little or some weight. This mitigation was weighed by the trial judge against the aggravating factors of HAC, capital murder committed during the commission of an attempt to commit kidnapping or attempted sexual battery, and capital murder committed for pecuniary gain.
Our function in a proportionality review is not to reweigh the mitigating factors against the aggravating factors. As we recognized in our first opinion in this case, that is the function of the trial judge. Bates, 465 So.2d at 494. Rather, the purpose of proportionality review is to consider the totality of the circumstances in a case and compare it with other capital cases. Terry v. State, 668 So.2d 954, 965 (Fla.1996). For purposes of proportionality review, we accept the jury's recommendation and the trial judge's weighing of the aggravating and mitigating evidence. We have performed this review and conclude that the death penalty for this particularly brutal murder is proportionate when compared with other cases in which a death sentence has been found to be valid. See Sliney v. State, 699 So.2d 662 (Fla.1997); Taylor v. State, 630 So.2d 1038 (Fla.1993); see also Marek v. State, 492 So.2d 1055 (Fla.1986).
*13 Within his proportionality argument, appellant asserts that the trial court erred by failing to find two statutory mitigators: that appellant was under extreme emotional distress and that appellant's ability to conform his conduct to the requirements of the law was substantially impaired. We do not agree. A mitigating circumstance must be "reasonably established by the greater weight of the evidence." Nibert v. State, 574 So.2d 1059, 1061 (Fla.1990) (quoting Campbell v. State, 571 So.2d 415, 419 (Fla.1990)). A trial court may reject a defendant's claim that a mitigating circumstance has been proved provided that the record contains competent, substantial evidence to support the trial court's rejection of the mitigating circumstances. Nibert, 574 So.2d at 1062. Based on the conflicting expert testimony in the record, we conclude that the trial court did not abuse its discretion in rejecting these statutory mitigators. Moreover, we note that the trial court did find that both of these mitigators were established as nonstatutory mitigation.
In his fifth issue, appellant contends that the trial court erred by failing to evaluate or even consider other nonstatutory mitigation. At his allocution hearing, appellant presented the trial court with: (1) his Department of Corrections records, asserting in his sentencing memorandum that he had a good institutional record; and (2) a sworn waiver of parole. Regarding appellant's waiver of parole, we have already determined that this was irrelevant evidence and find that the trial court did not err by not considering the waiver. Regarding the prison records, we find that the trial court's failure to address appellant's prison records in the sentencing order was error. See Campbell v. State, 571 So.2d 415, 419 (Fla.1990) ("When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant...."). However, we conclude that this error was harmless beyond a reasonable doubt. See Foster v. State, 679 So.2d 747 (Fla.1996); Lucas v. State, 613 So.2d 408, 410 (Fla.1992).
In his sixth issue, appellant argues that the trial court erred in excluding potential jurors from a jury pool without appellant being present. The trial court scheduled this resentencing to begin May 15, 1995. Appellant's lead counsel, Thomas Dunn, represented a death-sentenced defendant who was scheduled for execution in Georgia on May 15, 1995. On May 11, Mr. Dunn petitioned this Court for an emergency stay of the commencement of appellant's resentencing for twenty-four hours. We granted the request on May 12.
Following our May 12 order, the trial court held a telephone hearing to discuss with counsel what would be done with and told to the jury pool which had been summoned for May 15. When Mr. Dunn appeared at the courthouse on May 16, a controversy arose about what had in fact occurred when the jury pool appeared on May 15 and about the substance of the telephone hearing in respect to the jury pool. Appellant moved for a mistrial, claiming that the procedures which had been agreed to had not been followed.
In respect to the motion for mistrial, the trial court stated:
For the record, our jury selection process will begin today and that's in compliance with the Supreme Court in this particular case. Yesterday [May 15, 1995] we had the jury panel come in for all of the trials in the court system that were scheduled for trial this week. And that jury panel is not, was subject to trialsI think Judge Hess had trials scheduled that were supposed to be tried this week. As it turned out on Monday morning his trials scheduled turned out not to have all of the trials available so Judge Hess is also the judge assigned to hear juror excuses to the panel itself of all the jurors coming in to serve for all of the various courts that *14 would choose juries from that panel. So, there is nothing that violates the Supreme Court's stay because we have not gone through the jury selection process. Or began the jury selection process. The only thing I did yesterday was to go down, as we talked about on the phone, and advised the jurors that we would be selecting a jury, not beginning yesterday but beginning today and advising them that, not to read or listen or watch any reports about the case. Primarily because of the concern that expressed by counsel that possible pretrial publicity in this case and gave them that simple instruction to all of the perspective jurors. And I'll deny the defendant's request for motion for mistrial and we can proceed.
. . . .
... But as to the question concerning the jury, again the court notes this is the jury pool concept is what we operate out of. We pull our jurors from a pool of jurors and we have not yet pulled the pool or pulled the panel, so to speak, from the jury pool.
If we had summonsed these jurors specifically for this particular case and put them in the courtroom and the defendant was present and we had the jurors, which is what we're going to do today, that may be another matter. But we have a pool concept from that where we select jurors out of that pool for all the trials scheduled for this trial week of court and as part of that pool concept the judge that handles the pool does listen to and excuses jurors who are not able to serve and that's been a practice of the court for many years.
In this particular case we had followed that practice again, for example, jurors that Judge Hess picked the four or five cases that he thought he had to try on Friday, the one case he thought he had to try on Monday morning as it turned out we would not have had all the jurors available because they would have been selected on other juries. And the only concern that we really have to make sure we have sufficient people to pick a jury from.
You [Mr. Dunn] mentioned three hundred something people. I think we have a hundred, I'm not sure exactly how many we have.
. . . .
That appeared yesterday so we have a hundred something people available at this point in time to select the juror from.
. . . .
We summonsed that many. We didn't have that many show up. We summonsed a number of people and we have no shows and people that appear and are excused and what we end up with is the actual group of people we have. But I'll note the defendant's challenge. I'll deny the defendant's request for mistrial and we can proceed.
(Emphasis added). The trial court also noted that appellant's other counsel, Mr. Richmond, was present at the time the jury pool appeared on May 15:
And I think the record will establish that and the reason for that is to make sure that we wouldn't have a question about what may have happened or what I may have said in the presence of the jury panel because of some concerns Mr. Dunn expressed about what we did the last time about raising hands and pretrial knowledge of the case. But I'll note also that there was no specific objection made yesterday at the time too that, that needs to be placed on the record and
In denying the motion for mistrial, the trial judge stated:
I will also note for the record the State or case the State's, or the Defense is providing to the Court, Robinson case, '88 case, references Florida statute in a footnote on Page 3, footnote Number 1. They reference 40.01 but also reference 40.013 which is the statute that says persons disqualified or excused *15 from jury service and in that is 40.013, paren. 6 which is a person may be excused from jury service upon showing of hardship, extreme inconvenience or public necessity. And the State's correct that the procedure that this court employs in selecting jurors is to bring jurors down to a jury pool, they go through the qualifications, excusal process under the statute of 40.013 process and then the jurors that are qualified and not excused are available for service in a particular trial so I will note the Defendant's objection and deny the motion for mistrial.
In Robinson v. State, 520 So.2d 1 (Fla. 1988), we stated:
Clearly, the defendant was present from the beginning of his trial. We do not reach the question of whether appellant validly waived his presence during the prior general qualification process because we do not find that process to be a critical stage of the proceedings requiring the defendant's presence. We see no reason why fundamental fairness might be thwarted by defendant's absence during this routine procedure. Thus, we find no merit to appellant's contention regarding this absence.
Id. at 4. We reached a similar conclusion in Remeta v. State, 522 So.2d 825, 828 (Fla. 1988), in which we pointed out that "Remeta was present during the qualification of the specific jury to try his case, the entire individual voir dire, and the exercise of his peremptory challenges." In this case, appellant's co-counsel, Mr. Richmond, was present during the proceeding qualifying the jury pool and made no objection. Appellant's counsel had agreed that appellant would not be present on May 15 and had in fact requested the stay of the commencement of appellant's resentencing, which the trial court observed. Appellant and Mr. Dunn were present beginning on May 16 for the entire general and individual voir dire of the specific jury panel from which appellant's jury was selected. Also, appellant and Mr. Dunn were present during the exercise of challenges, rulings on the challenges, and excusals of members of appellant's jury panel.
We find no abuse of discretion in the trial court denying appellant's motion for mistrial. We do not find error in proceeding with jury pool qualification on May 15. Even if we agreed that it was error for the jury pool qualification to have proceeded on May 15 in light of our May 12 stay order, we find that, based on this record, any such error would be harmless beyond a reasonable doubt.
In his seventh issue, appellant claims that the trial court erred in denying appellant's request for expert assistance in establishing that appellant suffered from functional organic brain damage. Prior to trial, appellant was examined by two court-appointed medical experts who opined that appellant probably suffered some neuropsychological impairment. Pursuant to a motion made by appellant's counsel shortly before the resentencing was to begin, the court appointed a third expert, Dr. Crown, a neuropsychologist, to explore further the possibility of neuropsychological impairment. Appellant's counsel assured the court that Dr. Crown's appointment and testimony would not be used to delay the proceedings.
Although appellant's counsel told the jury in his opening statement that he intended to call Dr. Crown as a witness, appellant's counsel neglected to place Dr. Crown on his witness list. This omission was a clear discovery violation under Rule of Criminal Procedure 3.220(d)(1)(A). The State immediately moved to depose Dr. Crown, in lieu of striking the doctor's testimony. The trial court granted the State's motion. The State deposed Dr. Crown during a weekend recess. In his deposition, Dr. Crown opined that appellant suffered from organic brain damage. The following Monday, the State moved for further diagnostic testing to rebut Dr. Crown's expert opinion. In arguing against further diagnostic testing, appellant's counsel asserted:

*16 [T]he nature of the organic brain damage that Dr. Larson testified to, and that Dr. Crown will testify to, is not structural, it is functional. Basically he is talking about functional deficits or impairments dealing with problem solving, memory and auditory attention deficits. None of those types of functional deficits are impairments will likely show up on an MRI or a CAT Scan and, in fact, we would contend that either of those test results would basically serve no purpose for this jury or the court.
In light of appellant's discovery violation and the State's assurance that further testing would not delay the proceedings, the court granted the State's motion. The court noted that appellant's counsel
already anticipated some of what is involved because I think you indicated in your argument that Dr. Crown had suggested these were functional deficits and would not show up on an MRI. So, there is that aspect of it. That you've already anticipated, so to speak, if the MRI were to come out with no showing of organic brainSo, I don't feel there would be prejudice to the defense. It is not something new that if it did come out positive I think then that would be something new to the defense. But if it came out negative with no signs on the CAT scan or whatever, of organic brain impairment that would still be able to be answered by Dr. Crown's testimony. So I think the defense has anticipated that.
During a lunch recess, that same day, appellant was administered a Magnetic Resonance Imaging (MRI) test. The State's expert issued a report which the State produced to appellant when the testimony of witnesses ended that day. The report indicated that the MRI did not reveal the presence of organic brain damage.
Before testimony began the next morning, appellant moved the court to appoint a neuroradiologist, a radiologist, and a behavioral neurologist, claiming that these experts were needed to better understand the MRI results. Appellant also moved for a "spec. scan with Ceretec, ... preferably using a double or triple-headed camera. And, additionally, a quantitative E.E.G. to include evoked potential studies." Regarding the Ceretec test, the court noted that only two or three places in the United States, Florida not included, administer this test. The trial court denied both motions, stating:
Okay, the Court notes the Defense's argument, and there are, Dr. Larson is still involved in this case and Dr. McMahon is still involved in this case, and the Court's allowed the Defense to, to have a neuropsychologist, Dr. Crown, available to, to the defense. So the Court will deny the Defendant's request for additional experts and also deny the Defense's request for the additional testing.
Appellant then announced that he would not be calling Dr. Crown or presenting evidence on organic brain damage.
Appellant now argues that the trial court's refusal to appoint the additional experts compelled him to abandon a significant mental health defense involving organic brain damage. As a result, appellant asserts that he was denied a fair trial under the United States Constitution. Appellant cites to Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), for support.
In San Martin v. State, 705 So.2d 1337, 1347 (Fla.1997), cert. denied, 525 U.S. 841, 119 S.Ct. 105, 142 L.Ed.2d 84 (1998), we held with respect to the appointment of experts:
In evaluating whether there was an abuse of discretion courts have applied a two-part test: (1) whether the defendant made a particularized showing of need; and (2) whether the defendant was prejudiced by the Court's denial of the motion requesting the expert assistance.
Id. at 1346. Appellant has demonstrated neither. The record plainly shows that the negative MRI was consistent with what appellant's counsel believed it would show. Appellant represented Dr. Crown as having *17 the opinion that the functional brain damage he concluded that appellant had would not be revealed in the MRI. Based upon this record, we find that the trial court was within its discretion to decide that appellant had not made a particularized showing of need. Moreover, the trial court was within its discretion in determining that appellant should go forward with the testimony of the experts which appellant had requested before the resentencing began and which the trial court had granted. The trial court did not violate Ake by not appointing these additional experts during the resentencing under the circumstances presented here.
In his fourth and eighth issues, appellant argues that the trial court erred in finding each of the three aggravating circumstances. As to each aggravator, appellant contends that the trial court erred in finding that they were established beyond a reasonable doubt. In the alternative, appellant attacks the trial court's legal conclusion that the evidence supports the aggravating circumstances. In Willacy v. State, 696 So.2d 693 (Fla.1997), this Court set out our standard for reviewing aggravating circumstances:
[I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubtthat is the trial court's job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Id. at 695 (footnote omitted).
Appellant contends that the State failed to establish beyond a reasonable doubt that the murder was committed during an attempted sexual battery and kidnapping. We disagree. At the resentencing, the State introduced appellant's prior convictions for the attempted sexual battery and kidnapping. These convictions, which were affirmed by this Court on direct appeal, adequately support the trial judge's conclusion that this aggravator was proven beyond a reasonable doubt. Based on this record, we find that the trial court applied the right rule of law, and competent, substantial evidence supports its factual findings.
Next, appellant contends that the State failed to establish that the murder was committed for pecuniary gain. We disagree. As we stated on appellant's direct appeal, "[f]inding pecuniary gain in aggravation is not error when several felonies, including robbery, have occurred." Bates, 465 So.2d at 492. Appellant concedes that he was burglarizing the office building at the time of the murder and that, after the murder, police discovered the victim's wedding ring, which was taken from her finger, in appellant's pants pocket. Based on this record, we find that the trial court applied the right rule of law; and competent, substantial evidence supports its factual findings.
Next, appellant contends that the trial court erred in finding HAC because the State failed to establish that appellant intended to inflict a high degree of pain. We rejected a similar argument in Mahn v. State, 714 So.2d 391, 399 (Fla.1998). The trial court's sentencing order as to HAC provides in pertinent part:
The victim did not die an instantaneous type of death. Although the evidence establishes a time frame of five to ten minutes for this whole sequence of events to occur, the evidence also establishes it was an eternity of fear, emotional strain, and terror for Janet Renee White. When she returned from her lunch, Janet Renee White was confronted by the Defendant at the office where she was employed and a struggle took place inside the office/lobby area. The terror and fear experienced by the victim at that point is best evidenced by her scream as vividly described by the phone caller ... who placed the phone call at precisely the time Janet Renee *18 White first encountered the Defendant. There is no physical evidence inside the office to establish that the victim suffered any fatal stab wounds in the office location. The victim was therefore alive during this time frame. Her ordeal of fear, emotional strain and terror continued as she was forcibly taken by the Defendant from the office to a secluded wooded area approximately 100 feet in the rear of the office building. During this same time frame, the victim was severely beaten as evidenced by the approximately 30 contusions, abrasions and lacerations on various parts of her face and body. The bruising to the lower lip indicates the victim was struck in the mouth by the Defendant. The marks on her neck and hemorrhages located in her eyeballs establish she was partially strangled during this struggle. Again, the victim was alive during this attempted strangulation and beating. The Medical Examiner's testimony further establishes that the two fatal stab wounds occurred while the victim was lying on her back in the wooded area with her head forward so as to be able to see her assailant as the fatal stab wounds were inflicted by him. The victim had to be alive and conscious during this final attack because the evidence also establishes the victim had her arms in an upward position at the time the stab wounds were inflicted. She would then have been conscious for one to two minutes after infliction of the fatal stab wounds and fully aware of what had happened and was happening to her. Her death then occurred within five minutes after the stab wounds were inflicted due to loss of blood.
Our examination of the record reflects that the evidence presented at trial supports these findings. Based on these facts, we find no error in the trial court's legal conclusion that this murder was heinous, atrocious, or cruel. See Atwater v. State, 626 So.2d 1325, 1329 (Fla.1993) ("This Court has consistently upheld findings of heinous, atrocious, or cruel where the evidence shows the victim was repeatedly stabbed.").
Accordingly, we affirm appellant's death sentence.
It is so ordered.
HARDING, C.J., SHAW and WELLS, JJ., and OVERTON, Senior Justice, concur.
HARDING, C.J., concurs specially with an opinion, in which WELLS, J., concurs.
SHAW, J., concurs with an opinion.
ANSTEAD, J., dissents with an opinion, in which PARIENTE, J., and KOGAN, Senior Justice, concur.
HARDING, C.J., specially concurring.
I agree with the majority that Bates was not entitled to a jury instruction that life without the possibility of parole was a sentencing alternative to death because the 1994 amendment of section 775.082 was not applicable to his sentencing. I write separately to address the public policy reasons why the defendant should be denied this sentencing option.
I agree with the majority that this is first and foremost a case of statutory construction. "It is a well-established rule of construction that in the absence of clear legislative expression to the contrary, a law is presumed to operate prospectively." State v. Lavazzoli, 434 So.2d 321, 323 (Fla. 1983). Under this rule of statutory construction, there must be a clear expression of intended retrospective application; lack of expressed intent to apply the amendment prospectively does not equal intent to apply it retrospectively. Prospective application can be achieved either by silence or by an expressed intent that the amendment apply prospectively, but retrospective application can only be achieved by a clearly expressed intent to do so. "This rule applies with particular force to those instances where retrospective operation of the law would impair or destroy existing rights." Id. In this instance where the *19 amendment clearly imposes a more onerous sentence for those given a life sentence (no possibility of parole versus possibility of parole after twenty-five years), the Legislature would have to express such intent in clear and unequivocal language.[5]
In In re Standard Jury Instructions in Criminal Cases, 678 So.2d 1224 (Fla.1996), this Court recognized that the 1994 amendment "applies to offenses committed on or after the [May 25, 1994 effective] date" and that for crimes committed before the effective date the standard jury instruction "should be modified to comply with the statute in effect at the time the crime was committed." Id. at 1224 n. 1, 1225. As the majority opinion notes, at least three times we have subsequently reaffirmed this conclusion in capital cases. See Hudson v. State, 708 So.2d 256, 262 (Fla.1998) ("The amended statute cannot be applied retroactively."); Williams v. State, 707 So.2d 683, 684 n. 1 (Fla.1998) ("Because the murder here occurred after the amended statute's effective date, Williams is ineligible for parole."); Craig v. State, 685 So.2d 1224, 1230 n. 12 (Fla. 1996) ("Because Craig committed his crime on July 8, 1981, he is not eligible to receive a life sentence without the possibility of parole."). In the instant case, when Bates filed a petition requesting that this Court issue a writ of prohibition, a stay pending review, and a pretrial ruling on the applicability of the life without parole sentencing option, this Court denied the petition. See Emergency Motion for Writ of Prohibition and/or Writ of Mandamus & Stay Pending Review, Bates v. Sirmons, No. 85,056 (Fla. Jan.1, 1995); see also Bates v. Sirmons, 652 So.2d 816 (Fla.1995) (denying petition). While our denial of the petition does not constitute a ruling on the merits, the denial is consistent with our subsequent decisions on the issue.
Questions of retroactivity and ex post facto protections would only be implicated if the State were attempting to apply the amendment to Bates. The State has not attempted to sentence Bates under the amended statute and the Legislature has not expressed any intent that the amendment apply retrospectively. Although this Court has ruled that a defendant can waive ex post facto protections as part of an agreed-upon bargain by both parties, see Bowles v. Singletary, 698 So.2d 1201 (Fla. 1997) (finding that inmate waived any ex post facto argument as to forfeiture of gain time upon revocation of control release by accepting terms and conditions of early release under control release program), that is not the situation in the instant case where Bates wants to unilaterally choose to apply the amendment to his case. Thus, Bates' ex post facto protections are not implicated in this case and there are no rights to be waived by him.
"[I]t is firmly established law that the statutes in effect at the time of commission of a crime control as to the offenses for which the perpetrator can be convicted, as well as the punishments which may be imposed." State v. Smith, 547 So.2d 613, 616 (Fla.1989) (quoting with approval Heath v. State, 532 So.2d 9, 10 (Fla. 1st DCA 1988)); see also art. X, § 9, Fla. Const. Furthermore, the Legislature has the exclusive power to set criminal penalties, limited only by the Constitution. If we granted this defendant the power to choose what penalty should apply to him, we would run roughshod over the principle of the separation of powers. Neither this Court nor a defendant can simply choose what penalty will apply in any given case.
In my mind, permitting such a choice by the defendant here is analogous to permitting a defendant to decide that the jury will consider the death penalty as a possible sentence even though the State has elected not to seek the death penalty. In every first-degree murder case the prosecutor must make a determination as to whether the State will seek the death penalty against the defendant. Sometimes *20 the prosecutor will conclude that the State would be wasting its time and resources to seek the death penalty because the case does not warrant it. I do not believe this Court would, or should, permit a defendant to force the State to seek the death penalty even though it is a punishment authorized by statute for first-degree murder.
For all of these reasons, I must concur with the majority. I fear that any other course would cause great damage to many settled legal principles.
WELLS, J., concurs.
SHAW, J., concurring.
During the course of its deliberations, the juryobviously confusedposed the following questions to the court: "[A]re we limited to the two recommendations of life with minimum 25 years or death penalty. Yes. No. Or can we recommend life without a possibility of parole. Yes. No." The trial court responded in writing: "The court has advised you what advisory sentences you may recommend. Please refer to your copy of the jury instructions." The present majority opinion concludes that this response was proper. Majority op. at 11.
While I agree that the trial court's response was proper under the strict letter of the law, the response was of questionable helpfulness in light of the jury's expressed confusion in reading the instructions. I note that the court could have answered the questions with a simple "yes" and "no."
The yardstick by which jury instructions are measured is clarity, for jurors must understand fully the law that they are expected to apply fairly. Where a jury is confused concerning a point of law, the court must exercise sound discretion. In some cases, the court may properly refer the jury to the standard instructions in toto given in that particular case, but in many cases the preferred practice will be to direct the jury to specific instructions. Where appropriate, the court may also clarify a point of law with a brief clear response.

Perriman v. State, 731 So.2d 1243, 1246-7 (Fla.1999) (emphasis added). I recognize the invaluable role the standard instructions play in a criminal trial, and I also sympathize with a trial court's natural reluctance to depart from those instructions. I note, however, that at times a clear "yes" or "no" is the best response. In the present case, a "yes" and "no" would have eliminated any chance of juror confusion on this key point and would have done so at virtually no risk of reversal on appeal.
ANSTEAD, J., dissenting.
At issue is whether a defendant convicted of a murder that occurred before 1994, and who has the right to be sentenced under the pre-1994 sentencing scheme that allowed consideration of parole after twenty-five years, but whose sentencing will actually take place after 1994, can waive that right and voluntarily elect to be sentenced under the more severe 1994 sentencing scheme that does away with "consideration of parole."[6] I believe the majority's refusal to accept Bates' waiver of his ex post facto rights is unnecessarily harsh and inconsistent with our prior case law on waiver and sentencing. At trial Bates expressly agreed to waive any and all rights to be sentenced under the old law and to waive any and all entitlement to consideration of parole. The trial court rejected the waiver. The resolution of this issue is literally a matter of life and death in this case since the defendant's jury actually recessed its deliberations and came back and asked the trial court if it could *21 recommend life without parole as a sentence for the defendant.
Since the only person adversely affected by the waiver of the right to be sentenced under the old sentencing scheme is the defendant, it would seem appropriate to ask why the defendant should not be allowed to waive this right.[7] There simply is no plausible answer to that question set out in the majority opinion. Instead, the majority offers a non sequitur: the 1994 law cannot be applied to an earlier crime because it would violate the defendant's ex post facto rights. But it is those rights that the defendant is not only willing, but anxious to waive.[8]
In waiving his right to be sentenced under the older, less restrictive scheme, the defendant will be acting in accordance with the express public policy of the State of Florida as explicitly announced by the Legislature. Since 1994, the public policy of the State of Florida has been that persons convicted of first-degree murder are to be punished by either death or life imprisonment without the possibility of parole. Prior to that time, the sentencing options were similar, but the life imprisonment alternative was without the possibility of parole for twenty-five years rather than without the possibility of parole at all. Hence, the State of Florida and its prevailing public policy will be enforced and benefitted by the defendant's waiver.
In addition to the fact that a waiver would be consistent with prevailing legislative policy, this Court has consistently recognized that a defendant can waive constitutional protections. See Bowles v. Singletary, 698 So.2d 1201 (Fla.1997); Melvin v. State, 645 So.2d 448 (Fla.1994); Cochran v. State, 476 So.2d 207 (Fla.1985). In fact, Florida's extensive sentencing guidelines scheme has always permitted a defendant convicted of a noncapital offense the option of being sentenced under the prevailing sentencing law or sentenced under the law prevailing at the time the crime was committed. See § 921.001(4)(b); Cochran, 476 So.2d at 208. By voluntarily opting to be sentenced under the current scheme a defendant is deemed to have waived his ex post facto rights. Cf. Bowles, 698 So.2d at 1204. That is all the defendant is asking to do here, to be permitted to waive his ex post facto rights and give up any parole considerations. Capital murder cases have been excepted from the sentencing guidelines only because the sentencing options in such cases are fixed, i.e., death or life imprisonment. Florida's sentencing law has hardly been harmed or disrupted by allowing defendants to waive their ex post facto rights in all noncapital cases, and no harm has been advanced to prevent the same waiver here. Under the majority's holding we now have the anomalous situation that the only defendants in Florida who cannot waive their ex post facto rights and elect to be sentenced under the prevailing sentencing law are those charged with first-degree murder.
What then is a possible reason that waiver would not be permitted where the waiver would be perfectly consistent with prevailing public policy and the only one affected by the more severe sentencing option is the defendant? One can only speculate that it would be to deprive the defendant of the benefit of the appeal to be made to sentencing juries and judges under *22 the 1994 sentencing scheme that if they choose a life sentence over death they can be assured that life means life and the convicted murderer will not be eligible for parole. In other words, it is apparent that the defendant wishes to waive any speculative entitlement to parole under the old law in exchange for the calculation that the appeal of a defendant to a jury and judge for his life through the imposition of a life sentence might be slightly enhanced. The issue is especially important here where the defendant has been in prison since 1982 and his eligibility for parole would not be delayed for twenty-five years, but for less than half that. That is hardly an attractive sentencing option for a jury in a first-degree murder case. Surely that is why the jury in this case asked for the option of a life sentence without parole, an option the defendant is willing to accept but the majority rejects.
When all is said and done, the truth is that no valid public policy reason has been advanced to deny the defendant the right to waive his ex post facto rights and give a sentencing jury the option of applying Florida's prevailing public policy in capital sentencing to this case. It is done every day in noncapital cases and should be permitted here.
PARIENTE, J., and KOGAN, Senior Justice, concur.
NOTES
[1] Appellant's issues on appeal are: (1) whether the trial court's refusal to instruct the sentencing jury that life without the possibility of parole was a sentencing alternative to death denied him due process and a fundamentally fair capital sentencing proceeding; (2) whether the sentencing jury rendered a death verdict contrary to Florida statutory law and the trial court's jury instructions; (3) whether the trial court erred by excluding certain mitigation evidence; (4) whether the death sentence is disproportionate; (5) whether the trial court erred by failing to consider or evaluate relevant nonstatutory mitigation; (6) whether the trial court improperly qualified the jury pool in appellant's absence; (7) whether the trial court erred by not appointing additional medical experts to assist the defense in developing mitigation; (8) whether the trial court erred in finding each of the three aggravating circumstances; (9) whether the trial court erred by failing to allow appellant to introduce evidence of his innocence.
[2] Regarding part of his issue eight, we reject appellant's assertion that the aggravating circumstances found in this case and the instructions thereon are facially vague and overbroad. See Hall v. State, 614 So.2d 473, 478 (Fla.1993) (HAC); Blanco v. State, 706 So.2d 7, 11 (Fla.1997) (felony murder); State v. Dixon, 283 So.2d 1 (Fla.1973) (pecuniary gain). Regarding issue nine, we have followed the holding of the United States Supreme Court that no constitutional right to present "lingering doubt" evidence exists. See Sims v. State, 681 So.2d 1112, 1117 (Fla.1996); Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).
[3] See In re Standard Jury Instructions in Criminal Cases, 678 So.2d 1224, 1225 (Fla.1996) ("Note to Judge: For murders committed prior to May 25, 1994, the penalties were somewhat different; therefore, for crimes committed before that date, this instruction should be modified to comply with the statutes in effect at the time the crime was committed.")
[4] Appellant calls our attention to a recently enacted life-without-parole statute in Georgia. The editorial comments to that statute provide in relevant part that "[w]ith express written consent of the state, a defendant whose offense was committed prior to the effective date of this Act may elect in writing to be sentenced under the provisions of this Act." Appellant contends that the Georgia statute supports his argument that, absent any legislative intent to limit retroactive application the Florida statute, the defendant has a constitutional entitlement to the amended penal statute. We conclude that such an argument must fail in light of the lack of any indication that the Florida Legislature intended that its amendment to section 775.082(1), Florida Statutes (1993), have retroactive application. Moreover, we point out that the State vehemently objected to appellant's request at trial.
[5] If the Legislature had clearly expressed such an intent, I believe that the statute would be vulnerable to a constitutional challenge on ex post facto clause grounds.
[6] Sentencing under the old scheme was only marginally more lenient to defendants in any case, since the alternative was still life imprisonment and very few of those sentenced to life without the possibility of parole for twenty-five years may have had any reasonable expectation of actual parole after the twenty-five year term. The guarantee before the new sentencing scheme was only a "consideration of parole." Thus, those convicted of our most serious crime, capital murder, could have reasonably expected to face the most stringent, if not impregnable, obstacles to parole.
[7] The defendant, of course, under the ex post facto provisions of the federal and state constitutions, cannot be forced to submit to a harsher sentencing scheme. Indeed, that is why there are provisions for waiver of the ex post facto rights in Florida's sentencing guidelines that allow a defendant convicted of a noncapital crime to opt for sentencing under the prevailing guidelines rather than the law in effect at the time of the crime, permitting defendants convicted of crimes prior to October 1, 1983, to elect to be sentenced under sentencing guidelines. See § 921.001(4)(6), Fla.Stat. (1997).
[8] It is also important to note that the State of Florida in its brief filed in this Court in another case involving this same issue has suggested a proper procedure for allowing such a waiver. See State of Florida's Answer Brief at 94, Almeida v. State, 748 So.2d 922 (Fla. 1999). That is precisely the procedure the defendant attempted to follow here.